**In re Raymond A. COOK and Mary Lou Cook, Debtors.**

**Bankruptcy No. HG 89–01175.**

United States Bankruptcy Court, W.D. Michigan.

Dec. 22, 1992.

Robert A. Stariha, Fremont, MI, for debtors.

Robert F. Wardrop, Grand Rapids, MI, for Old State Bank of Freemont.

Ruth A. Ernst, Asst. U.S. Atty., Grand Rapids, MI, for U.S. on behalf of its agency, U.S. Dept. of Agriculture, Commodity Credit Corp.

Brett N. Rodgers, Chapter 12 Trustee.

## OPINION ON MOTIONS FOR MODIFICATION OF CHAPTER 12 PLAN

LAURENCE E. HOWARD, Chief Judge.

This Opinion embodies in written form a prior decision rendered from the bench and for the reasons stated herein, the motions for modification of the Debtor's chapter 12 plan of reorganization are granted.

### FACTUAL AND PROCEDURAL HISTORY

For many people, the hope of becoming a millionaire hinges on the purchase of a lottery ticket each week. The Michigan lottery generates over one billion dollars in revenue each year. Total prize money paid to hopeful participants in 1991 exceeded $500,000,000.00.[1] This Opinion evolves from the good fortune of the Debtors, Raymond and Mary Lou Cook, to win the Michigan lottery during the pendency of their chapter 12 reorganization.

---

1. For the year ending September 30, 1991, revenue from total lottery ticket sales which includes Daily 3, Daily 4, Lotto, Zinger, Keno, and Instant Ticket sales was $1,138,719,000.00. Total prizes awarded for the same year were $565,- 921,000.00. Michigan Bureau of State Lottery, *Statement of Revenues, Expenses, and Transfers for the Years Ending September 30, 1991 and 1990.*

The Debtors are dairy farmers who sought the protection of bankruptcy to save their business and livelihood. The Debtors filed a petition for relief under chapter 12 of the Bankruptcy Code[2] on March 30, 1989. In the schedules accompanying their petition, the Debtors listed a total secured debt of $495,611.84. Non-priority, unsecured debt was scheduled at $67,199.11.

At the time of filing, the Debtors' largest creditor was the Old State Bank of Freemont (hereinafter, "Old State Bank"). Prior to bankruptcy, Old State Bank loaned money to the Debtors for the operation of their dairy farm. In return, the Debtors granted Old State Bank a mortgage on the farm and security interests in equipment and livestock. Old State Bank filed a proof of claim with the court on June 23, 1989, in the amount of $276,527.91.[3] The Debtors also received funds from the Commodity Credit Corporation, an agency and instrumentality of the United States Department of Agriculture. On behalf of the United States of America, an amended proof of claim was filed in the amount of $3,431.43.

On February 9, 1990, this court entered an order confirming the Debtors' Third Amended Chapter 12 Plan of Reorganization (hereinafter, the "plan"). The plan provided for the submission of all present and future earnings of the Debtors to the supervision and control of the court for the repayment of creditors. Specifically, the plan called for monthly payments in the amount of $6,400.00 to be made to the chapter 12 trustee.[4] These payments were to commence in December, 1989 with that month's milk checks received by the Debtors. Additionally, the plan provided for a lump sum payment of $20,000.00 at the time of confirmation obtained from a settlement agreement entered into between Raymond Cook and Days Inn South and Hanover Insurance Company.

The plan set forth the classification and treatment of the various creditors of the Debtors. The claims of unsecured creditors, including secured creditors to the extent that any portion of their claim was undersecured, comprised Class F. These unsecured and undersecured creditors were to receive a 10% dividend on their claims. The plan tentatively provided for the claim of Old State Bank in Class G. The Debtors determined the total amount of Old State Bank's claim by reference to the proof of claim and proposed a monthly payment of $2,380.95. In their plan, the Debtors acknowledged the existence of a dispute over the value of collateral securing Old State Bank's claim,[5] but agreed for the purposes of confirmation that Old State Bank had approximately $200,000.00 in security. This provision was made contingent on a later valuation hearing.[6]

On June 6, 1990, I signed an order determining the value of Old State Bank's allowed secured claim. The value of equipment collateral was set at $36,000.00. The value of the Debtors' cattle was determined to be $31,850.00 and the Debtors' real estate was valued at $133,000.00 less

---

2. Unless otherwise noted, all statutory references are to Title 11 of the United States Code, referred to in this Opinion as the "Bankruptcy Code" or "Code."

3. Under § 501(a), a creditor may file a proof of claim against a debtor's bankruptcy estate evidencing the amount owed and the nature of the debt. The procedure for filing proofs of claim is found in Fed.R.Bankr.P. 3001.

4. The amount of the Debtors' monthly installment payment to the chapter 12 trustee was reduced during the course of reorganization by order of this court.

5. In their plan, the Debtors asserted that the value of Old State Bank's security was $92,-631.01. Contrastingly, Old State Bank, as recognized in the plan, argued that its secured claim

should be valued in excess of $200,000.00. Since the Debtors' appraiser was unavailable at the time of confirmation for testimony, the Debtors agreed to the $200,000.00 figure pending the outcome of a valuation hearing.

6. The extent or amount of a creditor's secured claim is determined under § 506(a) which provides:

[a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

any prior liens. Old State Bank appealed this determination. The appeal is currently pending before the United States District Court for the Western District of Michigan.

This summer the Debtors realized the dream of many people by winning $6,000,000.00 in the Michigan State lottery. After taxes, the Debtors will receive roughly $226,000.00 per year over the next twenty years. For Debtors who struggled as dairy farmers over the last few years, this windfall of such substantial revenue will most likely relieve any future financial worries.

Upon learning of their good fortune, the Debtors notified the chapter 12 trustee and attempted to ascertain the balance remaining to be paid under the terms of their 10% plan. After receiving their first payment of prize money in August, 1992, the Debtors remitted $101,000.00 to the trustee to pay off their plan. The Debtors used the rest of this first check to purchase additional cows and perform repairs to the farm.

Initially, Old State Bank filed a motion for modification of the Debtors' chapter 12 plan of reorganization. A hearing was held on this motion on September 29, 1992 at which time I met with the parties in chambers and it was agreed to adjourn consideration to afford other parties, including the chapter 12 trustee, an opportunity to be heard. In the interim, motions to modify have been filed by the chapter 12 trustee, Brett Rodgers, and by the United States of America on behalf of the U.S. Department of Agriculture. Each of the motions to modify request the same relief; namely, that this court enter an order compelling the Debtors to modify their plan of reorganization to provide a 100% dividend to the unsecured creditors.

The argument of these parties in support of modification is threefold. First, Old State Bank and the United States contend that the lottery prize money is part of the bankruptcy estate pursuant to § 1207(a). Next, looking at § 1229 which pertains to modification of a plan after confirmation, the parties argue that winning the lottery is a substantial change in the Debtors' circumstances justifying an increase in payment. The parties allege that the Debtors' lottery proceeds are sufficient to pay 100% of unsecured claims. Finally, a policy argument is expressed. With the Debtors possessing the right to $6,000,000.00 over the next twenty years, those seeking modification reason that it would be inequitable for the Debtors to receive a fresh start after paying only a 10% dividend to the unsecured creditors.

The Debtors respond with myriad objections attempting to avoid the increase. To begin with, the Debtors relying on their payment of $101,000.00 to the trustee, assert that the plan of reorganization has been completed and modification under § 1229 is no longer available. Second, the Debtors, at least in their initial brief, argue that Old State Bank lacks standing to seek modification. With the additional motions filed by the chapter 12 trustee and by the United States, this contention is dealt with easily. Looking at whether modification is warranted, the Debtors contend that due to an increase in their expenses since filing, even with the receipt of each annual prize check there has been no rise in the Debtors' income available for payment to creditors that is sufficient to warrant modification. Essentially, the Debtors assert that due to increased and unanticipated farm expenses their financial situation after winning the lottery is the same as it was when the plan was confirmed. The Debtors next turn to an analysis of the statutory basis for modification. The Debtors maintain that § 1229 cannot be used to force a debtor to increase plan payments based on a rise in disposable income. The Debtors insist that the disposable income test does not and should not factor into a decision on the appropriateness of modification. Even if it does, the Debtors argue that the bankruptcy court cannot force a debtor to commit a rise in income beyond 36 months to the payment of creditors under a plan of reorganization. The Debtors assert that their plan did not contemplate submitting future disposable income and since all parties are bound by the confirmed plan, they cannot now be required to commit any possible rise in disposable income caused by winning the lottery. Finally, the Debtors

also raise a policy based contention. To force a modification to increase payment to unsecured creditors, argue the Debtors, would encourage hiding unexpected windfalls from the trustee and the court.

I have jurisdiction to decide these motions for modification under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(b)(1).

In resolving the issues presented by this novel situation, various sections of chapter 12 need to be examined. Many of the provisions of chapter 12 concerning confirmation and modification are similar, if not identical, to those found in chapter 13. And, although family farmer reorganization may no longer be considered new and is relied on by a growing number of debtors, I am guided in my interpretation by cases filed under both chapters of the Bankruptcy Code. In the instances where they are cited, I find the chapter 13 cases equally reliable. *U.S. v. Arnold,* 878 F.2d 925, 927–28 (6th Cir.1989).

## DISCUSSION

The first issue to consider, as raised by the parties, is whether the Debtors' right to the lottery proceeds is part of the bankruptcy estate. Section 1207(a) of the Code provides that in addition to property and interests specified under § 541, property of the estate includes property which the debtor acquires after confirmation but before the case is closed, dismissed or converted to a case under Chapter 7. Section 1207(a) extends the broad inclusion called for under § 541 to postpetition and postconfirmation interests of the debtor. Courts that have considered this issue concur that postconfirmation lottery winnings and inheritance are part of the bankruptcy estate. *Cornelius v. Cornell (In re Cornell),* 95 B.R. 219 (Bankr.W.D.Okla.1989); *In re Koonce,* 54 B.R. 643 (Bankr.D.S.C. 1985).

The Debtors argue that the bankruptcy estate does not include the lottery proceeds until each annual check is actually received by them. The Debtors contend that MICH. COMP.LAWS ANN. § 432.25 bars inclusion under § 1207(a). This provision of Michigan law restricts the assignability of a lottery prize.[7] MICH.COMP.LAWS ANN. § 432.25 (Supp.1992).

A lottery winner's entitlement to a prize under Michigan law is governed by principles of contract law. *Paulsen v. Bureau of State Lottery,* 167 Mich.App. 328, 334, 421 N.W.2d 678 (1988), *appeal denied,* 431 Mich. 869 (1988); *Coleman v. Bureau of State Lottery,* 77 Mich.App. 349, 351, 258 N.W.2d 84 (1977), *appeal denied,* 402 Mich. 837 (1977). When the Debtors presented their winning ticket, they became contractually entitled to the annual payments of $226,000.00. Despite the anti-assignment statute, I have little trouble concluding, along with other courts, that the Debtors' interest in receiving the annual payments became part of the bankruptcy estate. *In re Meyers,* 139 B.R. 858 (Bankr.N.D.Ohio 1992). As one court put it,

> The debtors' position [that their pre-petition lottery winnings were not part of the bankruptcy estate under § 541(c)(2)] boggles the mind from a policy perspective, and certainly offends the spirit of bankruptcy law. These debtors would wish to enjoy their windfall uninhibited by previously established debts. [The debtors] tend not, as millionaires, to invoke an image of being trapped in a pit of debt, in need of a fresh start. With the monthly income that they can rely on enjoying for the next decade and beyond, free of the usual consumption of energy and investiture of time, it is understandable that the trustee has asserted that '[i]t would be inequitable to allow a millionaire to discharge $80,000.00 of debt.' The weekly annuity payments should be, and are as a matter of law and policy, included in the bankruptcy estate.

*Brown v. Boyn (In re Brown),* 86 B.R. 944, 947 (N.D.Ind.1988) (citations omitted).

---

7. Specifically, MICH.COMP.LAWS ANN. § 432.25 states:

(1) The right of any person to a prize drawn is not assignable, except that payment of any prize drawn may be paid to the family members or to the estate of a deceased prizewinner.

■ With the Debtors' right to the prize money clearly part of the bankruptcy estate, consideration can focus more directly on the question of modification. Postconfirmation modification is provided under § 1229(a) of the Bankruptcy Code. This section states:

> [a]t any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, on request of the debtor, the trustee, or the holder of an allowed unsecured claim.

Modification can be requested to increase or reduce the amount of payments on claims of a particular class, to extend or reduce the time for such payments or to alter the distribution to a class of creditors. 11 U.S.C. § 1229(a)(1)–(a)(3). Any modification must conform to the confirmation standards set forth in §§ 1222(a), 1222(b), 1223(c) and 1225(a). 11 U.S.C. § 1229(b)(1). A motion for modification is proper only if brought before the completion of payments under a chapter 12 plan. A motion for modification may be brought by the debtor, the trustee or by the holder of an allowed unsecured claim.

■ Postconfirmation modification of a chapter 12 plan may be requested for a variety of reasons. Most commonly, modification is sought by a debtor when there has been an unanticipated substantial decrease in income or downturn in circumstances or by an unsecured creditor or the trustee when a debtor experiences a windfall.[8]

■ The Debtors first argue that the motions to modify are not timely. Relying on their payment of $101,000.00 to the chapter 12 trustee in August, 1992, the Debtors maintain that the motions to modify were filed after completion of payments. If the Debtors argument is correct, there would no longer be a statutory right to modify. Under the specific language of § 1229(a)(1), a chapter 12 plan of reorganization can no longer be modified once all payments have been made as called for by the terms of the confirmed plan.

The Debtors interpret this requirement as having been met when payment is remitted to the trustee. As authority for their conclusion, the Debtors rely on the case, *In re Moss*, 91 B.R. 563, 565 (Bankr.C.D.Cal. 1988).

In response, the United States cites to the case, *In re Powers*, 140 B.R. 476 (Bankr.N.D.Ill.1992), where the bankruptcy court concluded that a motion to modify is timely and payments under a plan are not completed until the trustee makes final distribution of all payments to creditors. *Id.* at 481.

I have found no controlling case law on this issue, but would note that the Debtors' interpretation finds support in COLLIERS, which states that "the term 'payments under such plan' ... has generally been held to mean payments made by the debtor, rather than payments made by the trustee to creditors." 5 LAWRENCE P. KING, COLLIER ON BANKRUPTCY, ¶ 1329.01 at 1329–10 (15th ed. 1992).

Regardless of the chosen interpretation, I conclude that the motions to modify are timely. The $101,000.00 remitted by the Debtors to the trustee came from the first installment payment of the lottery prize. Chronologically, payment to the trustee occurred perhaps only hours before Old State Bank brought its motion to modify. The Debtors assert that since they hurriedly attempted to pay off their plan before a motion to modify could be brought, modification should be denied. I cannot approve of this conduct. The lottery proceeds are the grounds for the proposed modification. To condone the Debtors' action would establish a race to the courthouse type situation and would encourage future debtors to hide unexpected windfalls long enough to pay off their plans before the trustee or creditors gain knowledge of the beneficial change in circumstances.

Further, there has been credible testimony by the trustee that a sale required to be

---

**8.** For an excellent discussion of postconfirmation modification in chapter 13 cases see, Harry L. Deffebach, *Postconfirmation Modification of Chapter 13 Plans: A Sheep in Wolf's Clothing*, 9 BANKR.DEV.J. 153 (1992).

performed under the plan has not yet taken place. The proceeds of such sale were to be distributed to lienholders on the subject property. With this sale uncompleted and the proceeds yet to be disbursed, the motions to modify are timely and merit consideration.

■ On the issue of standing, the Debtors argue, in their first brief in response to the motion to modify, that Old State Bank is not an unsecured creditor. The valuation order entered by this court determined that Old State Bank is only partially secured by the Debtors' collateral. The Debtors contend that since this order has been appealed, Old State Bank cannot be considered an unsecured creditor. The valuation order is a final order of this court. Even though on appeal, until determined otherwise by a higher court it stands as a final and enforceable order. *Commodities Export Co. v. U.S. Customs Service,* 957 F.2d 223 (6th Cir.1992), *cert. den.* — U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 56 (1992). Accordingly, I conclude that Old State Bank has standing to bring its motion as a partially unsecured creditor of the Debtors.[9]

■ What is needed at this point is a test to determine when and whether upward modification is appropriate. As already stated, postconfirmation modification is available under § 1229 to increase the amount of payments on claims of a particular class. But no test is articulated as to when a motion to modify should be granted. The statute requires only that a motion to modify be brought by the debtor, the trustee or the holder of an allowed unsecured claim before the completion of payments and that the plan, as modified, complies with §§ 1222(a), 1222(b), 1223(c) and 1225(a).

Adopting a strict interpretation some courts hold that modification is permissible as long as the proper party timely brings the motion and so long as the proposed modification satisfies the various standards for the contents of a plan of reorganization

made applicable under § 1229(b)(1). *In re Powers,* 140 B.R. at 479–80; *In re Perkins,* 111 B.R. 671 (Bankr.M.D.Tenn.1990). In the *Powers* case, Judge Ginsberg concluded that a threshold change in circumstances need not be met before modification of a plan is allowed. Under this literal test, the circumstances necessitating modification are not considered.

Other courts adopt the requirement that modification is warranted only when there has been a substantial unforeseen or unanticipated change in the debtor's circumstances. *See, e.g., Arnold v. Weast (In re Arnold),* 869 F.2d 240, 241 (4th Cir.1989); *In re Anderson,* Nos. 587–03218, 587–03236, 1989 WL 222971 at *4 (Bankr. N.D.Cal.1989); *In re Grogg Farms, Inc.,* 91 B.R. 482, 485 (Bankr.N.D.Ind.1988). This test emerges from a balancing of two policies and sections of chapter 12.

Under § 1227(a) of the Code, the provisions of a confirmed plan bind the debtor and each creditor. "[C]onfirmation is res judicata as to those issues which could have and should have been raised prior to or in connection with confirmation." *E.g., In re Grogg Farms, Inc.,* 91 B.R. at 485; *In re Patterson,* 107 B.R. 576, 578 (Bankr. S.D.Ohio 1989). This section of the Code provides finality in determining the rights and duties of the various parties. The plan of reorganization can be pointed to by each party as determinative of their rights. The plan sets forth the payment each creditor is entitled to and can expect. The debtor through the plan achieves a degree of certainty in relation to the creditors and in the payment of his or her obligations.

Section 1229 allows modification despite the finality of a confirmed plan. Postconfirmation the debtor, the trustee or an unsecured creditor can request a change in treatment from what was originally proposed and ordered by the court.

Recognizing that the ability to modify a confirmed plan is tempered by the need for finality and by the binding effect of confir-

---

9. The Debtors do not question the standing of either the chapter 12 trustee or the United States.

mation as expressed in § 1227(a), many courts require a moving party to show a substantial and unanticipated change in circumstances before modification will be granted. *E.g., Arnold v. Weast (In re Arnold)*, 869 F.2d at 241–42.

I am persuaded that such an analysis should be adopted in this case. Modification should not be granted merely because the new plan complies with chapter 12 standards. This would allow serial filings for modification which could utterly frustrate reorganization. Confirmation is a significant event and parties need to be bound by the plan achieving court approval. The Code specifically mandates this. Unless something new happens, the debtor, the trustee and unsecured creditors should remain governed by the terms of the confirmed plan. And, unless the new event is unforeseen, parties should not be able to change a plan when the circumstances were known to them at confirmation. Ultimately, requiring a substantial and unanticipated change in circumstances is in accord with the idea that a confirmed plan is res judicata as to the debtor and scheduled unsecured creditors.

█ Looking at the requests for modification and the Debtors' situation in this matter, I find that there has been a substantial and unanticipated change warranting modification. The situation before me is a very fortunate one. I am not faced, as is often thought about bankruptcy, with a debtor, a farmer, seeking to lower monthly payments due to unforeseen hardship. Rather, this is a success story. For the next twenty years, the Debtors will receive $226,000.00.

I have witnessed the Debtors' attempt to retain their livelihood through reorganization. Now, the Debtors will be able to continue as dairy farmers, as I believe it is their intent, because they want to, because it is their choice. Such a windfall, however, is the type of occurrence that falls squarely under § 1229. Lottery winnings

and large inheritances mandate modification as much as any downturn in circumstances would. Receiving $226,000.00 per year on a one dollar ticket is a cause for celebration and in this instance it is a cause to pay more than a 10% dividend to unsecured creditors. It is only equitable that creditors be allowed to join in and share the celebration.

The Debtors argue that even with receipt each year of the lottery prize money there has been no change in their financial circumstances which would warrant modification. The Debtors assert that rising expenses have offset the increased income from the lottery. In the Debtors' initial brief in opposition to modification, the Debtors allege that their income was $80,-000.00 short of what was projected for the years 1990 and 1991. (Br. of Debtors in Resp. to Mot. for Modification Chapter 12 Plan after Confirmation Filed by the Old State Bank of Freemont at 8). If true, and if the lottery proceeds were used to offset this loss, the Debtors' financial situation will still improve by a net gain of $186,-000.00 per year. This increase is more than sufficient cause to modify the plan to provide a 100% dividend to unsecured creditors. It strains credulity for the Debtors to even argue that winning $6,000,000.00 in the lottery would not result in a rise in income significant enough to warrant modification.[10]

█ Left to decide are arguments concerning the mechanics of modification. To begin with, the Debtors argue that even if modification is warranted, their plan cannot be extended beyond 36 months. As of today, the Debtors' plan is nearly three years old. Under the Debtors' reasoning, only their first annual payment would be considered and could be utilized for the purpose of increasing a dividend to unsecured creditors.

Section 1229(c) provides:

A plan modified under this section may not provide for payments over a period

---

10. The Debtors raise a more persuasive and realistic argument, encountered later in this Opinion, that lottery proceeds received beyond the thirty-sixth month of the plan cannot be

considered in determining whether the plan can or should be modified to provide a 100% dividend to the unsecured creditors.

that expires after three years after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time.

The usual length of a plan of reorganization is set at three years. A plan may run sixty months, but only upon the finding of cause by the court. Under § 1229(c), the period which a modified plan may run is three years after payment was due under the original confirmed plan or five years after such date for cause. This period runs from the date of the first postconfirmation payment and not from the date when payment was first made preconfirmation to the trustee. *West v. Costen*, 826 F.2d 1376, 1378 (4th Cir.1987). Here, payment was due under the confirmed plan in December, 1989. If the three year deadline applies, modification could extend only a little more than one month. If the five year deadline is allowed for cause the plan may extend to December, 1994.

Reviewing the Debtors' third amended plan of reorganization, I find no specific time period set forth for the repayment of claims. There is no general language in the Debtors' plan limiting the duration to three years nor extending it to the maximum sixty months. The plan sets forth the payment terms for each particular class of creditors. For some classes of creditors no length of time is specified. Presumably, the Debtors wanted to continue making payments until that part of the plan was paid in full by the terms of the confirmed plan.[11] With respect to Class E, however, the Debtors' plan did establish a period over which payment would be made. Class E comprised creditors whose claims were secured by personal property and equipment. The plan provides for payment to this class over a period of five years.

Based on the circumstances of this case, I find that cause exists to extend the term of the Debtors' plan to five years or sixty months. By having the modified plan run sixty months, proceeds from the next two lottery checks received by the Debtors can be used to fund the increased dividend to the unsecured creditors. Such extension will permit creditors to receive 100% payment on their unsecured claims.

My computation that this is possible proceeds on the following facts. Over the sixty month life of the modified plan, the Debtors will receive three lottery payments of $226,000.00 equalling $678,000.00. It has been testified that in order to pay a 100% dividend, the Debtors owe roughly $250,000.00. Based on the facts before me, the Debtors' plan can and clearly should be modified to pay a 100% dividend to unsecured creditors over a potential five year plan.

A different result might occur if a 36 month plan had been confirmed. But, in extending the length of the plan beyond three years, the Debtors are not being forced to accept a time period that was not contemplated by their plan of reorganization.

In the Debtors' supplemental brief they argue that an increase in monthly payments cannot be required. Focusing on the language of the modification statute, the Debtors point out that § 1229(a)(1) envisions increasing payments to a particular class of creditors and says nothing about increasing the plan's monthly payment amount. This argument of the Debtors is bewildering to me and is without merit. Clearly, Old State Bank, the trustee and the United States are seeking exactly what the statute allows. The motions before me request that the plan be modified to provide for 100% payment to unsecured creditors. There is unambiguous statutory authority for this request. Modification is expressly permitted to increase payment to a particular class of creditors. This includes requiring a 100% dividend to unsecured creditors to be accomplished through increased monthly payments or whatever means are feasible and comply with

---

**11.** For instance, under the plan Class F unsecured creditors were to be paid 10% of their claims. No time for repayment is specified.

§ 1229(b)(1) and the standards expressed therein.

The last arguments of the Debtors concern the disposable income requirement found in § 1225(b)(1)(B).[12] The Debtors contend that the modifications sought are impermissible because the moving parties are seeking to impose the disposable income requirement retroactively onto their original confirmed plan in order to support upward modification. The Debtors assert that the commitment of future disposable income was not contemplated by the confirmed plan and cannot be mandated.

To begin with, the Debtors' plan, in compliance with § 1222(a)(1), specifically submits all present and future earnings to the supervision and control of the court. This is a mandatory provision of all plans of reorganization. It is not a recognition of the disposable income test, but it is the Debtors' commitment to use their future income and earnings to fund the plan. Without regard to performance of the disposable income test, the Debtors have and must agree to submit future earnings toward execution of the plan as confirmed or as modified. It is error for the Debtors to contend that modification is impermissible because they cannot be forced to use the lottery proceeds to fund an increased dividend to creditors.

Modification is permissible in this instance without regard to the disposable income test. Modification is warranted in light of the change in the Debtors' circumstances and permissible because payment of 100% to unsecured creditors can be accomplished according to the chapter 12 standards regarding contents of a plan and confirmation as expressed in § 1229(b)(1). For modification to be granted it has to be determined under § 1229 that the Debtors'

lottery winnings now enable them, in the sense of feasibility under 1225(a)(6), to pay a 100% dividend to unsecured creditors. And, a court must find, for cause, that modification can be accomplished over a five year life of the plan in compliance with the other standards made applicable to modified plans as set forth in § 1229(b)(1). In light of the lottery payments the Debtors will receive, modification to require full payment to unsecured creditors is proper and must be granted.

Under these circumstances, to arrive at any other conclusion would be unjust and would violate the principles under which we proceed in bankruptcy. The fresh start is available to the honest debtor unable to meet his or her obligations. When a debtor proves able to pay creditors in full within the life of the plan such modification is warranted and will be required. I am pleased for the Debtors in this case. I am sure, even with paying a 100% dividend to unsecured creditors, that the Debtors will be able to enjoy a fruitful next twenty years free of pressing financial worries. Section 1229 permits modification under these circumstances and is properly granted.

## CONCLUSION

Accordingly, the motions for modification are granted. The Debtors' plan shall be amended to provide full payment to unsecured creditors. The plan as amended shall conform to the standards set forth in chapter 12.

---

12. Section 1225 provides for the submission of a debtor's disposable income as follows:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period, or such longer period as the court may approve under section 1222(c), beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.